# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

JOSEPH MALACHI LADOUCIER,

*Plaintiff*,

v.                                                                    Case No. 10 CV 5089 (RJH)

THE CITY OF NEW YORK, a municipal entity,
RETIRED NEW YORK CITY POLICE OFFICER
CHRISTOPHER WILLIAMS, NEW YORK CITY
POLICE SERGEANT JIMMI HERNANDEZ,
NEW YORK CITY POLICE OFFICERS
"JOHN DOES 1-9," CHERYL NICHOLS,
RAFAEL REVERON,

*Defendants.*

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

**JOSEPH MALACHI LADOUCIER**,
Plaintiff,

By

WYLIE M. STECKLOW, ESQ.( WMS 6012)
10 SPRING – SUITE 1 – N Y C   10012
Phone:          212 566 8000
Fax:             212 202 4952
E-mail:         Wylie@WylieLAW.com

Table of Contents

Preliminary Statement                                                              -1

Statement of Facts                                                                 -3

Relevant Legal Standards                                                           -9

**Argument: The Defendants Have Not Shown Grounds For Dismissal of Plaintiff's Claims**

**A. Defendants' Initial Motion Submission In This Case Seems To Indicate That The Plaintiff's False Arrest Claim Is Sufficiently Pled In The Complaint         -10**

    **I.   Issues Of Fact Preclude A Determination Of Probable Cause At This Stage Of The Case.                                                                       -11**

    **II.  Defendants Cannot Meet Their Burden Of Proving Probable Cause As An Affirmative Defense At This Juncture.                                          -11**

    **III. Even If Probable Cause Could Be Found Upon The Facts Alleged In The Complaint, The Parameters Of The Inquiry On The Instant Motion Preclude A Finding Of Qualified Immunity As A Matter of Law.                           -17**

**B. The Defendants Have Not Shown That The Plaintiff's Claims For Malicious Prosecution Cannot Succeed, As Their Arguments Hinge On The Existence Of Probable Cause To Arrest The Plaintiff.                                           -19**

**C. The Plaintiff's Monell Claims Are Sufficiently Pled And Supported Under The Settled Standards Of The Second Circuit.                                          -20**

**D. There Are Various Legal Standards Under Which This Honorable Court Can Retain Supplemental Jurisdiction Over Plaintiffs' State Law Claims                  -23**

    **I.   This Court Is In No Way Bound To Apply The State Of New York's Procedural Requirements In Hearing This Federal Question Case.                       -23**

    **II.  Specific Notice Requirements of Pendent State Law Claims Should be Deemed Satisfied when Notice to Municipality is Obvious and Admitted             -24**

Conclusion                                                                         -25

**Preliminary Statement:**

Without advancing a personal opinion as to his character, it is a matter of record in this case that Plaintiff Joseph Malachi LaDoucier is a man who buys coffee and donuts for his co-workers on his way in to work in the morning. On the morning of Tuesday, November 24, 2009, Mr. LaDoucier had a truly terrible morning commute.  After inadvertently bumping into a postal worker, Defendant Cheryl Nichols, while exiting a crowded rush hour train, Mr. LaDoucier was verbally abused and stalked by Defendant Cheryl Nichols, then tackled, struck and choked in front of his office by Defendant Nichols' colleague, Defendant Rafael Reveron.  To put the proverbial cherry on top of a truly terrible morning, Defendant Cheryl Nichols called the police, concocting the first of several stories that she would advance to inveigle the police and courts into becoming instruments of her strange vendetta against Mr. LaDoucier, all while Defendant Rafael Reveron sat on Mr. LaDoucier and choked him outside of his office.

The Defendants in this case have advanced a number of implausible allegations, first to support Mr. LaDoucier's abortive prosecution, and now to justify their roles in same, and all of them raise serious questions of credibility.  First and foremost among these questions is: why would a responsible adult professional with no prior criminal or arrest record suddenly turn into a serial assaulter of postal workers?  Then, setting aside the sheer strangeness of this first fundamental inquiry, why would this man on an alleged mission against the mails pause repeatedly in the course of his putative crusade to buy breakfast foods for himself and his professional colleagues?  Finally, if these two inquiries are both disregarded or chalked up to Mr. LaDoucier's supposed deviousness or madness, then how did this supposed menace to letter carriers manipulate Defendant Rafael Reveron into following him a block away from Defendant Reveron's own workplace to the doorstep of his own office, and then why did Mr. LaDoucier throw away his own purchases of a few moments previous to take an unprovoked swing at the much larger Defendant Reveron, who promptly responded by beating and choking him senseless?

The factual allegations advanced by Defendants Nichols and Reveron simply do not make sense, and were further uncorroborated even among the parties themselves:  Defendant Nichols made allegations against Mr. LaDoucier, Defendant Reveron made allegations against Mr. LaDoucier, and their friend Jerry Pompey made allegations against Mr. LaDoucier, but none of the allegations made by

1

any one of them related in any way with the allegations made by the other, or if they did, it was only to the extent of suggesting that Mr. LaDoucier has a strange and heretofore unprecedented mental issue that sets him against postal workers. Defendant Nichols has alleged at least three contradictory versions of the events underlying the incident herself, at least two of which were available to the Defendant Officers who responded to the scene of the incident. The complaining witnesses' facially dubious allegations do not corroborate one another, and no investigation was undertaken to confirm them, seemingly at any point during Mr. LaDoucier's arrest and prosecution.

The Defendant Police Officers in this case, who responded to the scene and arrested Mr. LaDoucier, including but not limited to Defendant Retired Police Officer Christopher Williams ("Defendant Officer Williams") and Defendant Police Sergeant Jimmi Hernandez (Defendant Sergeant Hernandez"), had a legal duty to investigate and corroborate these cumulative but non-corroborative accusations before making an arrest, and they willfully or negligently disregarded that duty to the detriment of Mr. LaDoucier. Instead, the Defendant Police Officers opted to take the various strange accusations presented to them at face value, and arrested Mr. LaDoucier on multiple assault charges, leading him away from the entrance to his place of work in handcuffs. All the charges against Mr. LaDoucier were dismissed by the New York County Criminal Court on the initiative and at the discretion of the sitting judge at Mr. LaDoucier's second post-arraignment Court appearance due to the People's failure to corroborate all relevant allegations in the criminal complaint. As the above makes clear, this lawsuit has been brought to advance Mr. LaDoucier's quest for answers to some very basic questions. The first and foremost among them is, simply: why were these terrible things allowed to happen to me?

Much as the trilogy of Supreme Court holdings in <u>Celotex v. Catrett</u>, 477 U.S. 317, 327 (1986), <u>Matsushita v. Zenith</u>, 475 U.S. 574 (1986) and <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986) dramatically heightened the showing that litigants must set forth to bring a Federal civil action from discovery to trial, <u>Twombly v. Bell Atlantic</u> and <u>Iqbal v. Ashcroft</u> have established a "plausibility pleading" standard that litigants must overcome to bring their cases before the Court at all, let alone receive a full and fair determination of their claims on their merits. While the Plaintiff maintains that "plausibility pleading" is an unreasonable, unfair and one-sided standard that does not serve the interests of justice, Plaintiff has nevertheless dutifully pled his claims against Defendants to that

standard in his First Amended Complaint ("Complaint").   Where, as here, Defendants have advanced a series of facially implausible contentions in order to justify the various questionable actions that they undertook to the detriment of the Plaintiff, Mr. LaDoucier, denial of their motion to dismiss Mr LaDoucier's complaint is surely warranted.

The proponents of the instant motion apparently understand this as well, as they have submitted an affidavit from Defendant Cheryl Nichols with the instant F.R.C.P. 12(b)(6) motion, containing yet another distinct set of implausible (and sinister) allegations against Mr. LaDoucier.  As discussed below, Defendant Nichols' affidavit is inadmissible on the current motion unless the court exercises its power under F.R.C.P. 12(d) to convert the instant motion from an F.R.C.P. 12(b)(6) motion to dismiss for failure to state a claim to an F.R.C.P. 56 motion for summary judgment.  If the Court opts to do so, the manifold unresolved questions of material fact presented here, or indeed, within the Defendants' own produced records such as the criminal complaint (Defendant's Exhibit E- Plaintiff allegedly punched Defendant Cheryl Nichols once at 51st Street), 911 Sprint report (Defendants' Exhibit C- Plaintiff allegedly pushed Defendant Cheryl Nichols "just now") and Defendant Nichols' affidavit (Defendants' Exhibit D at ¶¶6-7- Plaintiff allegedly punched Defendant Cheryl Nichols twice at 42nd Street), would plainly cause this motion to fail under that standard as well.  This case, and Mr. LaDoucier's own quest for answers, should be allowed to proceed on the law and in the interest of justice.

**Statement of Facts:**

The Plaintiff, Joseph Malachi LaDoucier, is a responsible professional in his thirties who had no criminal or arrest record whatsoever prior to the incident complained-of here.  Plaintiff's First Amended Complaint (hereinafter "Complaint"), ¶¶21-22.  Mr. LaDoucier is a mixed-race individual with tan skin, blue eyes, and curly hair that he was wearing in cornrows at the time of the incident giving rise to this action.[1]  On the morning of Tuesday, November 24, 2009, at or around 8:30 A.M., Mr.

---

[1] This fact is tendered to the court in opposition to Defendants' FRCP 12(b)(6) motion as an adjudicative fact which the court may take judicial notice of under FRE 201(b)(2) and pursuant to Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("When determining the sufficiency of plaintiffs' claim for *Rule 12(b)(6)* purposes, consideration is limited to… [among other categories,] matters of which judicial notice may be taken….").

LaDoucier was taking an uptown express train on the Lexington Avenue line to Grand Central-42[nd] Street as a part of his morning commute from his residence in Brooklyn to his office in midtown Manhattan.  Complaint at ¶¶ 6[2], 18, 21, 24.  As usual at that hour, the train was packed sardine-tight. Id. at ¶¶22, 23.  Mr. LaDoucier was passing the time listening to music on headphones as the train approached Grand Central.  Id. at ¶25.  When the train arrived at Grand Central, Mr. LaDoucier and many other train passengers pressed and shifted towards the train doors to exit, in a ritual "straphanger shuffle" familiar to any New York City subway commuter.  Id. at ¶¶28-30.

Though he did not think it was important at the time, as Mr. LaDoucier participated in the straphanger shuffle from the express train onto the platform at Grand Central, he and another participant, later identified as Defendant Cheryl Nichols, made inadvertent unintentional contact.  Id. at ¶¶32, 34-35.  These sorts of unintentional contacts are common on the subway during rush hours, particularly at Grand Central, and Mr. LaDoucier's did not think that straphanger's etiquette required any particular recognition of this contact, as it seemed to be within normal tolerances.  Id. at ¶¶ 33, 35. As Mr. LaDoucier attempted to exit the express train, Defendant Cheryl Nichols addressed him, though he did not hear her at first because he was still listening to music on his headphones.  Id. at ¶¶32, 37-38.  Noticing at length that Defendant Cheryl Nichols was continuing to address him in what seemed to be a hostile manner, Mr. LaDoucier removed one of his headphones to hear what she was saying, and heard Defendant Cheryl Nichols saying rude and hurtful things to him which hurt his feelings.  Id. at ¶¶39-42.  Mr. LaDoucier did not respond to Defendant Cheryl Nichols' goading as he exited the express train and crossed the platform to wait for the uptown local train.  Id. at ¶¶43-45.  Defendant Cheryl Nichols followed Mr. LaDoucier, and continued haranguing him on the platform and crowding his personal space in an aggressive manner that is sometimes referred to as "getting in his face."  Id. at ¶¶45-47.  When Defendant Cheryl Nichols escalated her harassment of Mr. LaDoucier to the point of bumping her body up against Mr. LaDoucier repeatedly while continuing her steady stream of invective, Mr. LaDoucier had enough.  Id. at ¶¶46-48.  Stepping away from Defendant Cheryl Nichols,

---

[2] Due to a typographical error not discovered until preparation for this memorandum, Plaintiff's Complaint and Amended Complaint identify Plaintiff as a resident of Queens County, when Plaintiff is in fact a resident of Kings County. Pursuant to F.R.C.P. 8(e), which dictates that pleadings be construed so as to do justice, Plaintiff respectfully requests that the Court and Parties disregard said harmless typographical error.

Mr. LaDoucier made a rude rejoinder in response to Defendant Cheryl Nichols' continuing verbal abuse, then immediately pointed to the security cameras on the platform and warned Defendant Nichols that their interactions were being recorded.  Id. at ¶¶49-52.  Defendant Nichols stepped back for a moment while continuing to hurl invective at Mr. LaDoucier, but soon resumed her prior physical crowding of Mr. LaDoucier's personal space as well.  Id. at ¶¶53-54.  Mr. LaDoucier told Defendant Cheryl Nichols to back off, then sought to put significant distance between himself and Defendant Nichols, walking away from her towards another part of the train platform.  Id. at ¶¶55-56.

When the uptown local 6 train arrived, Mr. LaDoucier boarded the train and made sure that he was standing in at least a different part of the train car than Defendant Cheryl Nichols.  Id. at ¶¶57-59.  Mr. LaDoucier exited the 6 train at the 51st street station, as did many of the train's passengers who had transferred from the uptown express to the local at Grand Central, since 51st Street is the only local stop between the Lexington Avenue Line's express stops at Grand Central and 59th Streets. Id. at ¶60, see fn1.  As Mr. LaDoucier walked down the train platform towards the exit, he saw Defendant Cheryl Nichols standing ahead of him in the center of the pedestrian walkway, faced against traffic and staring fixedly at Mr. LaDoucier, deliberately waiting for him to approach.  Complaint at ¶¶61-64.  As Mr. LaDoucier approached and passed Defendant Cheryl Nichols on his way to the station exit, she began following him and resumed goading and insulting him.  Id. at ¶¶65-66.  Mr. LaDoucier, who had put his headphones back on, did not respond to Defendant Cheryl Nichols and tried his best to ignore her continuing verbal abuse.  Id. at ¶¶67-69.  As soon as he could, Mr. LaDoucier deliberately distanced himself from Defendant Cheryl Nichols and proceeded along his way to work.  Id. at ¶70. Throughout this entire encounter and thereafter, Mr. LaDoucier did not strike Defendant Cheryl Nichols, even in self-defense, and the only individual who claimed otherwise was Defendant Cheryl Nichols herself.  Id. at ¶¶104-105.

Mr. LaDoucier proceeded towards his office on the east side of 3rd Avenue between 55th and 56th Streets, stopping first at a "Pret a Manger" café on the west side of 3rd Avenue between 53rd and 54th Streets to buy a tray of coffees for himself and his co-workers, then crossing 3rd Avenue at 54th Street to buy donuts for himself and his co-workers from the donut cart in front of the Post Office at 3rd Avenue between 54th and 55th Streets.  Id. at ¶¶70-72.  His hands filled by a tray of coffees and one or more bags of donuts, Mr. LaDoucier had just resumed walking towards his office when he observed

Defendant Cheryl Nichols, Defendant Rafael Reveron and several other individuals speaking in a cluster in front of the post office, where those individuals and the Defendants Cheryl Nichols and Rafael Reveron apparently worked.  Id. at ¶¶73-76, 84.   Mr. LaDoucier walked away, towards his office, without communicating with any of the individuals who had been speaking in front of the post office, and soon noticed a man who was considerably larger than him, later identified as Defendant Rafael Reveron, following him.  Id. at ¶¶78-79, 83.

Defendant Rafael Reveron began to push, threaten and taunt Mr. LaDoucier as they walked, and Mr. LaDoucier did not respond to Defendant Rafael Reveron's words or physical provocations.  Id. at ¶¶80-82.  As Mr. LaDoucier approached the door to his office building, Defendant Rafael Reveron tackled Mr. LaDoucier to the ground, in the process spilling the coffee and donuts that Mr. LaDoucier was holding.  Id. at ¶¶85-86.  Once Mr. LaDoucier was on the ground, Defendant Rafael Reveron struck the prone Plaintiff repeatedly in addition to sitting on Mr. LaDoucier's chest and choking Mr. LaDoucier.  Id. at ¶¶87-89  Mr. LaDoucier could not breathe and feared for his life.  Id. at ¶¶90-91.  Security guards from Mr. LaDoucier's office building called the police, and at least one of them asked Defendant Rafael Reveron to stop choking the Plaintiff.  Id. at ¶¶92-93.  Throughout this entire encounter and thereafter, Mr. LaDoucier did not strike Defendant Rafael Reveron, even in self-defense, and the only individual who claimed otherwise was Defendant Rafael Reveron himself.  Id. at ¶¶94-95.

Police officers arrived on the scene, including Defendant Officer Williams and Defendant Sergeant Hernandez as well as the "John Doe" Defendant Police Officers (collectively, "Defendant Officers"), and began questioning Mr. LaDoucier and Defendant Rafael Reveron.  Id. at ¶¶96-99[3], 116.  One of the Defendant Officers asked Mr. LaDoucier if he had punched "this lady," presumably referring to Defendant Cheryl Nichols, and Mr. LaDoucier responded that he had not, though he did state that he may have accidentally bumped into her getting off the train.  Id. at ¶¶100-103.  Despite having not personally observed Mr. LaDoucier engaging in any illegal acts, and without engaging in any further investigation, one or more of the Defendant Officers then arrested Mr. LaDoucier, placing him in handcuffs in front of his office building and in view of one or more of his fellow employees.  Id. at ¶¶106-110, 122, 126-131.  Mr. LaDoucier did not resist in any way.  Id. at ¶111.

---

[3] Due to a typographical error not discovered until the preparation of the instant memorandum, Defendant Officer Williams is mistakenly identified at ¶96 of the Complaint as "Defendant New York City Police Officer Christop Walker," though his correct shield number is listed.  See fn2.

In a misdemeanor complaint authorized by Defendant Sergeant Hernandez, sworn out by Defendant Officer Williams, and based entirely on information received from Defendant Cheryl Nichols, Defendant Rafael Reveron and their co-worker, Jerry Pompey, Mr. LaDoucier was charged with two (2) counts of PL §120.00, 3rd Degree Assault, a class A misdemeanor.  Id. at ¶¶113-115, 117-118. Based entirely on Defendant Cheryl Nichols' uncorroborated accusation, the misdemeanor complaint falsely alleged that Mr. LaDoucier intentionally struck Defendant Cheryl Nichols.  Id. at ¶¶119-122. Based entirely on Jerry Pompey's uncorroborated accusation, the misdemeanor complaint falsely alleged that Mr. LaDoucier screamed threats at Defendant Cheryl Nichols on Third Avenue.  Id. at ¶¶123-126. Based entirely on Defendant Rafael Reveron's uncorroborated accusation, the misdemeanor complaint falsely alleged that Mr. LaDoucier intentionally attempted to strike Defendant Rafael Reveron in front of Mr. LaDoucier's office.  Id. at ¶¶127-129.  This final allegation should have been facially implausible to Police Officers responding to the scene, as Mr. LaDoucier was being held on the ground being beaten by Defendant Reveron in the midst of spilled coffees and donuts when they arrived; given the various food debris, it should have been clear to the Defendant Police Officers that Mr. LaDoucier did not have a free hand to attempt to strike Defendant Rafael Reveron as that Defendant alleged.  Id. at ¶¶129-131.  This allegation also contradicted the November 24, 2009, 911 Sprint Report ("911 Report"), attached to Plaintiff's Attorney Affirmation In Opposition To Defendants' Motion To Dismiss ("Plaintiff's Affirmation") as Exhibit A (exhibits hereinafter referred to as "Plaintiff's Exhibit ____"), in which Defendant Nichols claims that Mr. LaDoucier pushed her, not Defendant Reveron, prior to Defendant Reveron tackling Mr. LaDoucier.

Further inconsistencies and changing points in Defendants' allegations against Mr. LaDoucier include, but are not limited to: the changing injuries alleged by Defendant Nichols and her changing stories as to where those injuries were sustained.  *Compare* – 911 report, Plaintiff's Exhibit A, "902… pushed her just now…"; *and* Criminal Complaint, Plaintiff's Exhibit B- "…at about 0845 hours…defendant, inside the subway station at 51st Street and Lexington Avenue, strike the informant about the torso with defendant's fist…."  Defendant Nichols also alleged to the Defendant Officers that Mr. LaDoucier and she had other interactions prior to the incident, a one-time claim which was not adopted by Defendants in Mr. LaDoucier's prosecution or the instant action. *See* Omniform Complaint Report, Plaintiff's Exhibit C- [Defendant Nichols claims that she] "has had numerous verbal arguments

with… [Mr. LaDoucier] over the last week…."  Additionally, Defendants alleged fundamentally different facts leading to Defendant Reveron tackling the Plaintiff at differing points in and after the incident. *Compare* Plaintiff's Exhibit A- "902… pushed **her** just now… 2 men postal workers holding him down now…." (emphasis added); and Plaintiff's Exhibit B- "Rafael Reveron… at about 0850 hours… observed defendant [Mr. LaDoucier] swing at [Defendant Reveron]…. informant then tackled the defendant…."

In the Complaint at ¶¶193-197, Plaintiff sets forth various allegations of unconstitutional policies, practices and customs of the Defendant City of New York's police department ("NYPD") that Plaintiff believes contributed to his extraordinary arrest in this case.  Among other alleged unconstitutional policies, practices and customs, the practice, custom, or tacit policy of arrest quotas or "productivity goals" is alleged to have played a part in Mr. LaDoucier's arrest.  Id.  In support of this allegation, Plaintiff pled a statement of NYPD Deputy Commissioner Paul J. Browne that was reported by the media on January 20, 2006, where Deputy Commissioner Browne admitted to the NYPD's practice of setting "productivity goals."  Id. at ¶195, *see also* Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77[th] Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010 ["Browne said the department 'does not impose quotas but it has productivity goals related to actual conditions in a given command.'"].[4]  Plaintiff additionally pled a recorded statement of a 41st precinct NYPD supervisor explaining that each of his officers is held to a twenty summons per month and one arrest per month enforcement quota, as reported by ABC News on March 3, 2010. Complaint at ¶196; see also Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC, March 3, 2010 ("'They have to meet a quota. One arrest and twenty summonses,' said Officer Polanco…. audio recording… obtained by Eyewitness News seems to back up Officer Polanco's assertion of a quota.").[5]  Plaintiff also pled a recorded statement of an 81st precinct NYPD sergeant instructing his officers to make "special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.  Complaint at ¶197; *see also* Rayman, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into

---

[4] *See* fn1; article available online at http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html; article and memos referenced therein attached as Plaintiff's Exhibit D.

[5] *See* fn1; article and video containing relevant recording excerpts available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356; article attached as Plaintiff's Exhibit E.

A Ghost Town," Village Voice, May 11, 2010 ["Supervisors told officers to make an arrest and 'articulate' a charge later…. [t]hese collars came to be called 'Mauriello Specials....' [t]he larger problem with the precinct's strategy, however, was that it seemed to stretch the legal definition of the 'probable cause' standard."].[6]  Since the filing of the Complaint, Plaintiff has additionally discovered an NYPD internal memo that was obtained by the New York Times, in which the author states that NYPD "supervisors have made statements that could be interpreted as the setting of quotas for enforcement activity."  See Plaintiff's Exhibit G; *see also* Baker, Al and Robbins, Liz, "A Quota By Any Other Name," New York Times City Room, January 13, 2011.[7]

### Relevant Legal Standards

"In reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted… [the Court] accept[s] as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet, 482 F.3d 184, 191 (2nd Cir. 2007) (internal citation omitted). "To survive a motion to dismiss, a complaint must plead `enough facts to state a claim for relief that is plausible on its face.'" Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008), *quoting* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Pursuant to Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993),

> [w]hen determining the sufficiency of plaintiffs' claim for *Rule 12(b)(6)* purposes, consideration is limited to [1]the factual allegations in plaintiffs' amended complaint, which are accepted as true, [2] to documents attached to the complaint as an exhibit or incorporated in it by reference, [3] to matters of which judicial notice may be taken, or [4] to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.

The Affidavit of Cheryl Nichols submitted by Defendants, dated November 16, 2010, falls into none of the Brass categories. If evidence is submitted on an FRCP 12 motion that is not part of the pleadings, and the Court does not exclude such evidence, FRCP 12(d) states that

---

[6] *See* fn1; article available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/; article attached as Plaintiff's Exhibit F.

[7] *See* fn1; article available online at http://cityroom.blogs.nytimes.com/2011/01/13/a-quota-by-any-other-name/; article attached as Plaintiff's  Exhibit H.

9

the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

"On a motion for summary judgment, all factual inferences must be drawn in favor of the non-moving party." Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2nd Cir. 2003), *citing* Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 343 (2d Cir. 1999). "Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law."  Id.

"The purpose of § 1983 is to deter state actors from using… their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992) (internal citation omitted). 28 U.S.C. §1983 is not a source of substantive rights but a method for vindication of federal rights elsewhere conferred. Baker v. McCollan, 443 U.S. 137, n3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979).

A party's failure to respond to all or part of an opponent's 12(b)(6) motion does not constitute a default warranting dismissal of the complaint; "the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." McCall v. Pataki, 232 F.3d 321, 322-3 (2d Cir. 2000)


**Argument: The Defendants Have Not Shown Grounds For Dismissal of Plaintiff's Claims**


**A.  Defendants' Initial Motion Submission In This Case Seems To Indicate That The Plaintiff's False Arrest Claim Is Sufficiently Pled In The Complaint**

Plaintiff contends that the fundamental inquiry on this motion is whether the facts and allegations that were pled as set before the Defendant Officers in the incident giving rise to this action properly provided those Defendant Officers with probable cause to arrest Mr. LaDoucier.  "In analyzing § 1983 claims for unconstitutional false arrest… [Courts] have generally looked to the law of the state in which the arrest occurred." Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004)  It is well settled here in New York that "[w]henever there has been an arrest and imprisonment without a warrant, the [arresting] officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful...." Broughton v. State, 37 N.Y.2d 451, 458 (N.Y. 1975), *cert. denied*, 423

U.S. 929 (1975) (collecting cases).  New York does not require plaintiffs to allege lack of probable cause in false arrest or imprisonment actions arising out of warrantless arrests; instead, the burden is on Defendants to prove that probable cause existed as an affirmative defense.  Id., *citing* Rodriguez v. City of New York, 149 Misc.2d 295, 296 (N.Y. Sup. Ct. 1990).   This is a steep burden, and Defendants do not meet it on the facts presented in the pleadings and associated documents.

The proponents of the instant motion recognize that they cannot meet their burden within the parameters of the motion they propounded, and instead primarily attempt to meet this burden through the presentation of an additional affidavit of Defendant Cheryl Nichols, which is not an item within the categories of materials that Courts in the Second Circuit may consider on an F.R.C.P. 12(b)(6) motion pursuant to Brass at 150 and F.R.C.P. 12(d).  In the event that this Honorable Court opts to consider the additional *ipse dixit* allegations set forth in the affidavit of Defendant Cheryl Nichols submitted by the proponents of this motion, Plaintiff respectfully requests prompt notice of that decision and the opportunity to file a supplemental memorandum in opposition to the so-converted motion for summary judgment, as well as a statement of material controverted facts pursuant to Local Rule 56.1, which will focus in no small part on the controversies of fact presented by the various conflicting statements of Defendant Cheryl Nichols herself.

## I. Issues Of Fact Preclude A Determination Of Probable Cause At This Stage Of The Case.

Because significant disputes exist as to the material and relevant facts and knowledge of the officers that led to the arrest at issue here, probable cause may not be determined as a matter of law at this early stage of the instant action. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); see also Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997).

## II. Defendants Cannot Meet Their Burden Of Proving Probable Cause As An Affirmative Defense At This Juncture.

In this case, Defendants contend that the Defendant Officers had probable cause to arrest Mr. LaDoucier based solely on the various non-corroborative allegations of Defendants Nichols and Reveron and their friend Jerry Pompey.  In so doing, they rely on several cases that are distinguishable from this case on facts and law, or simply inapposite to the inquiry before the Court in the instant

motion.  Defendants first cite to <u>Martinez v. Simonetti</u>, 202 F.3d 625, 634 (2d Cir. 2000) for the proposition that officers may form probable cause on the basis of information provided by eyewitnesses or putative victims.  In <u>Martinez</u>, this proposition was advanced to support the grant of qualified immunity to supervising officers who authorized Martinez' arrest on the basis of information given to them by fellow police officers who were also the putative victims of an assault initiated by the Plaintiff.  <u>Id</u>.

 In so ruling on this qualified immunity issue in <u>Martinez</u>, the Second Circuit did not conclude its inquiry with the Defendant's propounded citation, which was advanced as dicta. <u>Id</u>.  Instead, the <u>Martinez</u> Court went on to cite in the Court's holding on the qualified immunity issue to <u>Singer</u> at 119, which sets forth the Second Circuit's basis for analyzing whether probable cause could be found in that case with the proposition that "An arresting officer advised of a crime by a person who claims to be the victim, **and who has signed a complaint or information charging someone with the crime**, has probable cause to effect an arrest **absent circumstances that raise doubts as to the victim's veracity**." (citations omitted) (emphasis added).  Where, as here, circumstances exist that raise doubts as to the complainant's veracity, and where an arrest was effected prior to the signing of a complaint or information, the <u>Singer</u> test is not facially satisfied and the shorthand rule set forth in the qualified immunity context in <u>Martinez</u> is clearly inapplicable.  The Second Circuit's holding in <u>Martinez</u> is further distinguished by the Martinez Court's further reference to  <u>Bernard v. United States</u>, 25 F.3d 98, 102-03 (2d Cir. 1994) for the proposition that police officers are entitled to rely upon the allegations of fellow police officers.

 Defendants also omit the provenance of the shorthand rule cited in <u>Martinez</u>, but then separately cite that shorthand's district court provenance in their naked citation to <u>Miloslavsky v. AES Engineering Soc'y, Inc.</u>, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) later in the same string of citations.  In <u>Miloslavsky</u>, the Court did not simply set forth the blanket proposition advanced by Defendants, but instead hewed to the <u>Singer</u> standard, stating that "a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, **who it seems reasonable to believe is telling the truth**."(emphasis added).  <u>Id</u>.  Where, as here, the putative victims and eyewitnesses told non-corroborative and changing stories about the Plaintiff that (1) unilaterally absolved those putative victims of criminal liability for what appear to be concerted

criminal acts; and (2) were at least in part facially contradicted by basic reference to the scene at which the responding Defendant Officers arrived, probable cause cannot be established solely by reference to their statements as a matter of law.

However, despite the inapplicability of Martinez to the instant action, Defendants have found another way to shoehorn it into their arguments.  Defendants also cite to the the Second Circuit's decision in Coons v. Casabella, where that Court found that a state trooper had qualified immunity for his actions in arresting a man who had admitted to drinking several beers before being involved in a one-car accident as driver, on the basis that the trooper had arguable probable cause under well-established New York case law to arrest an individual in those circumstances.  284 F.3d 437 (2d Cir. 2002).  The internal quotation from Coons at 441, invoked by Defendants as originating from Cerrone v. Brown, 246 F.3d 194, 198 (2d Cir. 2001) is actually quoted from qualified immunity discussion in Cerrone at 203, where it was in turn cited from the qualified immunity discussion in Martinez at 634, which emphasized that police officers may reasonably rely on the information provided to them by **fellow officers** at the scene of a crime.  To be clear, the Plaintiff does not dispute that information relayed to officers by their fellow officers requires no further investigation or corroboration before it can serve as the basis of probable cause to arrest, so long as the information is sufficient in and of itself.  Rather, in keeping with well-settled precedents, Plaintiff merely contends that the allegations of complaining witnesses should be corroborated when they are as outlandish, inconsistent and unreliable as the various allegations advanced against Mr. LaDoucier here.  See, e.g., Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994) ("Information about criminal activity provided by a single complainant can establish probable cause **when that information is sufficiently reliable and corroborated**.") (emphasis added) (internal citations omitted).

Defendants also cite to then-Associate Justice Rehnquist's dicta in Illinois v. Gates, 462 U.S. 213, 233-34, stating that "if **an unquestionably honest citizen** comes forward with a report – which if fabricated would subject him to criminal liability – **we have found** rigorous scrutiny of the basis of his knowledge unnecessary."  (emphasis added).  Defendants omit the above-emphasized "we have found" from their invocation of this dicta in their memo at page 9 with good reason, as the "we" referenced in that citation is in fact only comprised of Justice Rehnquist himself.  Justice Rehnquist supported this dicta in Gates only by citing to his own prior dicta in Adams v. Williams, 407 US 143,

146-47.  In <u>Adams</u> at 146-47, Justice Rehnquist advanced his own belief that an informant's tip was sufficient to justify a stop, not an arrest, on the basis of a Connecticut state law that makes giving knowingly false reports to law enforcement officers illegal.  While Justice Rehnquist was a respected jurist, that does not make his personal beliefs on human nature precedential, even when he cites to prior instances in which he let them be known.

Plaintiff contends that both Justice Rehnquist's self-referential dicta and the actual holding in <u>Gates</u> militate towards a finding for the Plaintiff in this inquiry for several reasons.  First and foremost, Plaintiff notes that Defendants have propounded no arguments or evidence that would support a finding that any of the complainants from the incident underlying this action are unquestionably honest citizens, and further notes that such unquestionable honesty cannot be imputed to the Defendants under the motion standards applicable here.  See <u>McCarthy v. Dun & Bradstreet</u> at 191. Moving beyond these initial points, Plaintiff notes that the Court's holding in <u>Gates</u> at 238 reaffirmed the "totality of the circumstances" test for probable cause to arrest, and that the Supreme Court's decision in that case was contingent upon significant corroboration of the there-anonymous informant's tip that led to the Gates' arrest.  <u>Id</u>. at 227-28.  Plaintiff contends that under the detailed allegations in the complaint and admissible supporting documents, it is clearly plausible that the Defendant Officers lacked probable cause to arrest Mr. LaDoucier under the "totality of the circumstances" test affirmed in <u>Gates</u>.  <u>Id</u>.

Other cases cited by Defendants illustrate the significant gap between the quantum of evidence alleged by Defendants to give rise to probable cause in this case and the quantum of evidence required by Courts in this District to establish the same showing.  Judge Stein's decision on a summary judgment motion in <u>LaFontaine v. City of New York</u> demonstrates that the claims of a complaining witness, standing alone, are not necessarily sufficient to supply probable cause. 2009 U.S. Dist. LEXIS 105838 (S.D.N.Y. Sept. 30, 2009).  In <u>LaFontaine</u>, the complaining witness's initial report to 911 was corroborated in numerous key respects before the arresting officer determined that he had "no reason to doubt the truthfulness of the complainant…." and arrested Plaintiff LaFontaine.  <u>Id.</u> at *2.  To wit, the officer who arrested LaFontaine found the Plaintiff in that case pulling out of the location named by the complaining witness in a car that matched the complaining witness' description. <u>Id</u>.  Further,

upon stopping the Plaintiff's car, police found that the Plaintiff was indeed a federal officer and was armed with a handgun, as the complaining witness had additionally alleged.  Id.

Some of the cases cited by Defendants are distinguishable from this case not only on procedural posture and facts, but are also further distinguishable on the basis of legal ratification of the arresting officers' probable cause determinations.  Krause v. Bennett was a post-judgment appeal on a full trial record in a case where probable cause to arrest the Plaintiff was initially based on officer observation, which was then corroborated by a supporting deposition from a county employee and ratified by an arrest warrant executed by a town justice. 887 F.2d 362, 364, 366 (2d Cir. 1981). Similarly, Judge Motley's decision on summary judgment for Defendants on the issue of probable cause in Williams v. City of New York was made on a record in which an indictment had been returned against the Plaintiff by a grand jury, which creates a presumption of probable cause under New York law that is recognized and adopted by Federal Courts in this Circuit. 2003 U.S. Dist. LEXIS 19078, *2. (S.D.N.Y. Oct. 23, 2003); Marshall v. Sullivan, 105 F.3d 47, 54 (2d. Cir. 1996).  Williams is further distinguished because in that case the complaining witness, a stabbing victim, made multiple "'positive', 'lucid', and 'sure….'" identifications of the Plaintiff in a photo-array and a lineup.  Williams at *2.  Finally, the Plaintiff in Williams independently confirmed several key aspects of the complaining witness' allegations.  Id.

"The law in the circuit is, therefore, that uncorroborated allegations by an eyewitness or victim do not necessarily establish probable cause…. [o]n the contrary: Second Circuit case law stresses the importance of investigation and corroboration." Wu v. City of New York, 934 F. Supp. 581, 587 (S.D.N.Y. 1996).  In this case, the Defendant Officers performed no investigation beyond speaking to Defendants Nichols and Reveron at length and asking Mr. LaDoucier if he had hit Defendant Cheryl Nichols, which he denied.  The Defendant officers sought no warrant or indictment, and did not make Defendants Nichols and Reveron or their friend Jerry Pompey sign a complaint prior to arresting Mr. LaDoucier.  In sum, the Defendant Officers could only have based their assessment on probable cause to arrest Mr. LaDoucier on non-corroborative complaining witness statements, the particulars of which had already changed considerably between Defendant Nichols' 911 call and the Defendant Officer's arrival on scene, and which has since changed again to allege another set of circumstances.  "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest…. [r]easonable

avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." <u>Bevier v. Hucal</u>, 806 F.2d 123, 128 (7th Cir. 1986); *accord* <u>Oliveira</u> at 647.

In all, Defendants' reliance on their various citations discussed above is at best misplaced, and none of the cases cited by Defendants conclusively support the Defendants' contention that Mr. LaDoucier's arrest was predicated on probable cause as a matter of law.  Of the remaining four District Court opinions advanced by Defendants in support of their arguments, two were argued and lost by clearly outmatched *pro se* plaintiffs, and Plaintiff respectfully submits that both minimal discussion of, and minimal reliance upon, these non-controlling cases is warranted.  *See* <u>Fox v. City of New York</u>, 2004 U.S. Dist. LEXIS 6844 (S.D.N.Y. Apr. 20, 2004) (pro se plaintiff's action dismissed because police had probable cause to arrest him on domestic violence allegation called in then dropped by victim; police also had probable cause to arrest pro se plaintiff for second assault witnessed by additional bystander several days later); <u>Daniels v. City of New York</u>, 2003 U.S. Dist. LEXIS 19765 (S.D.N.Y. Nov. 5, 2003) (police who arrived on scene to find complaining witness being treated by paramedics and pro se plaintiff claiming that he had never touched complaining witness and accusing complaining witness of initiating fight, had probable cause to arrest both parties under the circumstances alleged by pro se plaintiff in his complaint.).

The remaining two cited district court cases, while not pro se, arise out of cases where plaintiffs merely failed to make requisite showings in their pleadings to support their claims that the police lacked probable cause to arrest them, and do not set forth any legal bar to the claims alleged in this case.  In <u>Puckowitz v. City of New York</u>, the plaintiff failed to plead reasons why his arresting officers had reason to doubt the allegations of the complaining witness, instead asserting that those officers had a duty to conduct additional investigation solely on the basis of the Plaintiff's denial of the allegations against him. 2010 U.S. Dist. LEXIS 97733, *6 (S.D.N.Y. Sept. 17, 2010).  The Court in <u>Cabble v. City of New York</u> also found the plaintiff in that case's complaint insufficient on the grounds that it failed to raise a factual basis for the police to doubt the veracity of the complaining witnesses. 2009 U.S. Dist. LEXIS 26478, *14 (S.D.N.Y. Mar. 30, 2009).

In this case, Plaintiff has specifically pled multiple plausible factual bases for the Defendant Officers to doubt the veracity of the allegations advanced by Defendants Cheryl Nichols and Rafael Reveron, as well as those of their friend Jerry Pompey.  *See, e.g.,* Complaint at ¶105 (no corroboration

that Mr. LaDoucier struck Defendant Nichols), ¶135 (no corroboration that Mr. LaDoucier attempted to strike Defendant Reveron before Defendant Reveron tackled, choked and punched Mr. LaDoucier), ¶¶130-131 (Mr. LaDoucier did not have a free hand to strike Defendant Reveron as alleged), ¶132-133 (postal workers have a reputation for rage-fueled violence and allegations advanced by three postal workers to justify a large postal worker's assault on a smaller individual should be corroborated), ¶134 (facial implausibility of Mr. LaDoucier suddenly besmirching his theretofore clean criminal record by assaulting multiple postal workers during his morning commute).  Plaintiff has additionally identified further inconsistencies in Defendant Nichols allegations in documents before the Court on the instant motion.  *See* above at 7, comparing 911 report (*See* Plaintiff's Affirmation, Exhibit A) and criminal complaint.  (*See* Plaintiff's Affirmation, Exhibit B).  In all, on the record that may be considered on the instant motion and by the standards which the Court must employ in determining same, it is entirely plausible that the Defendant Officers lacked probable cause to arrest Mr. LaDoucier.  The Plaintiff's false arrest claim should be allowed to proceed.

### III. Even If Probable Cause Could Be Found Upon The Facts Alleged In The Complaint, The Parameters Of The Inquiry On The Instant Motion Preclude A Finding Of Qualified Immunity As A Matter of Law.

"In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." Weyant at 857.  The Fourth Amendment right to be free from being arrested without probable cause is well-recognized in the Second Circuit.  Martinez at 634, *citing* Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir. 1997); Cook v. Sheldon, 41 F.3d 73, 78 (2d Cir. 1994); Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987).  Plaintiff submits that qualified immunity is not determinable as a matter of law on the instant motion, because, as discussed above, under the circumstances presented and pled in this case, it is unclear which specific allegations were communicated by Defendant Cheryl Nichols, Defendant Rafael Reveron and their friend Jerry Pompey to the Defendant Officers to putatively support probable cause to arrest Mr. LaDoucier at the time of his arrest. *See, e.g.,* Day v. Morgenthau, 909 F.2d 75, 78 (2d Cir. 1990) (§1983 false arrest claim reinstated on appeal; qualified immunity denied as pleadings did not identify what facts were known to appellant at time of arrest).  In this case, the Defendant Officers responded to a 911 call alleging that Mr. LaDoucier had threatened to shoot Defendant Cheryl Nichols and pushed her on 56th Street, prompting Defendant

Reveron and another male to tackle and restrain Mr. LaDoucier.  When they arrived on the scene, the Defendant Officers found Defendant Reveron alone sitting on and striking Mr. LaDoucier, who had no gun, and Cheryl Nichols then alleged that Mr. LaDoucier had in fact struck her in the subway at 51st Street.  In the narrative section of the Omniform Complaint Report filed in the criminal case underlying the instant action, Defendant Nichols claims that she "has had numerous verbal arguments with… [Mr. LaDoucier] over the last week…," a claim which was not advanced by her at any other point in Mr. LaDoucier's prosecution or the instant action.  Since the inception of the instant action, Defendant Nichols has again changed her story and now claims that Mr. LaDoucier struck her twice in the subway at 42nd Street.  The Plaintiff submits that while he has pled his Complaint to the "plausibility pleading" standards announced in <u>Iqbal</u> and <u>Twombly</u>, there is simply no way to determine on the basis of the pleadings specifically what information was provided to the Defendant Officers by Defendant Cheryl Nichols, Defendant Rafael Reveron, and their friend Jerry Pompey, let alone whether that information was sufficient to give the Defendant Officers arguable probable cause to arrest Mr. LaDoucier.

While the specific allegations that were advanced to the Defendant Police Officers cannot be determined on the pleadings in this case, a plausible explanation for the Plaintiff's arrest is pled through specific factual allegations in the Complaint: the Defendant Police Officers willfully or negligently failed to investigate the claims of these complaining witnesses and instead effected a warrantless arrest based on cumulative, non-corroborative and unsubstantiated *ipse dixit* allegations that were both internally inconsistent and contradicted by the state of the scene to which the Defendant Police Officers responded.  This conduct flies in the face of both objective reasonableness and well-settled Second Circuit standards that acknowledge that, absent further investigation or corroboration, complaining witness statements may only form the basis for probable cause to arrest when they are presented in circumstances that do not provide reason to doubt those complainants' veracity.  *See, e.g.,* <u>Singer</u> at 119.  At this stage of the instant litigation, Plaintiff simply does not know whether this dereliction of legal duty was negligent or willful, but as will be discussed further below, Plaintiff has specifically pled several fact-supported allegations of unconstitutional customs and practices of the NYPD, including but not limited to so-called "productivity goals" or, more colloquially, arrest quotas, that may plausibly have contributed to Mr. LaDoucier's arrest. If one or more of these alleged unconstitutional customs and practices are proven at trial, that finding would absolutely

negate any claims to qualified immunity that may be advanced by the Defendant Officers.  See, e.g., Ricciuti v. New York City Transit Auth., 124 F.3d 123, 130 ("Qualified immunity is unavailable where… the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise.")(internal citation omitted). In all, on the record that may be considered on the instant motion and by the standards which the Court must employ in determining same, it is not possible to determine as a matter of law whether the Defendant Officers are entitled to qualified immunity for their conduct in arresting Mr. LaDoucier.  The Plaintiff's false arrest claim should be allowed to proceed.

**B. The Defendants Have Not Shown That The Plaintiff's Claims For Malicious Prosecution Cannot Succeed, As Their Arguments Hinge On The Existence Of Probable Cause To Arrest The Plaintiff.**

Under New York State law, the tort of malicious prosecution is found upon four elements: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice[.]" Colon v. New York, 60 N.Y.2d 78, 82 (N.Y. 1983) (internal citations omitted).  A §1983 claim for malicious prosecution in New York is found upon the same elements as the state law tort. *See, e.g.,* Kinzer v. Jackson, 316 F. 3d 139, 143 (2d Cir. 2003).

Applying these elements of malicious prosecution to the facts of this case, it is clear on the record of this motion that a proceeding was initiated against the Plaintiff and that the proceeding terminated in his favor.  The proponents of this motion argue that the Defendant Officers cannot be held liable for malicious prosecution because they did not initiate the criminal action against the Plaintiff, but this is a dubious contention at best, as Defendants Nichols and Reveron clearly lacked the power to arrest Mr. LaDoucier or to initiate his prosecution without the Defendant Officers or some police officers' cooperation.  The Defendant Officers arrested Mr. LaDoucier and Defendant Officer Williams filed a criminal complaint against Mr. LaDoucier under the authorization of Defendant Sergeant Hernandez; under these facts, settled Second Circuit precedents militate towards holding Defendant Officer Williams, at very least, chargeable for initiation of the criminal case at issue here in addition to Defendants Nichols and Reveron.  *See, e.g.,* Mejia v. City of New York, 119 F. Supp. 2d 232, 272 (S.D.N.Y. 2000); *citing* Ricciuti at 130 ("A… Detective… who files a charging affidavit is clearly a complaining witness, but other witnesses may be considered complaining witness as well if the information they falsely gave the prosecutor induced the prosecutor to act.").

19

As discussed above, the disputed issues of fact on the record even now before the Court preclude a finding of probable cause as a matter of law at this juncture.  *See* Weyant at 852.  As to the element of malice, Plaintiff submits that it is well-settled under Second Circuit precedents that the element of malice may be inferred from the **initiation** of an action without probable cause.  *See, e.g.,* Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996); Ricciuti at 131.  As probable cause to arrest the Plaintiff cannot be determined as a matter of law on the instant motion, it is entirely plausible that any or all of the Defendant Officers may have played a role in the malicious prosecution of Mr. LaDoucier through participation in his arrest.  In all, Plaintiff has pled sufficient facts to plausibly support his claims for malicious prosecution pursuant to well-settled case law, and that claim should be allowed to proceed.

**C. The Plaintiff's Monell Claims Are Sufficiently Pled And Supported Under The Settled Standards Of The Second Circuit.**

Defendants dubiously advance the conclusory assertion at page 23 of Defendants' Memo that Plaintiffs do not allege a plausible basis for his Monell claims in the Complaint, which, as all of Defendants' arguments, is premised on the challenged proposition that the Defendant Officers had probable cause to arrest Mr. LaDoucier.  The Plaintiff disagrees, and contends that he has pled several well supported Monell claims that should survive the instant motion.  "In order to impose § 1983 liability upon a municipality, a plaintiff must demonstrate that any constitutional harm suffered was the result of a municipal policy or custom." Sorlucco v. New York City Police Dept., 971 F. 2d 864, 870 (2d Cir. 1992), citing Monell v. Dept. of Social Services, 436 U.S. 658, 690-91 (1978) (additional citations omitted).

> Although there are several different ways of establishing municipal liability under Section 1983, the two relevant to this case are proving that (1) the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously chooses not to train its employees in proper application of the policy; or (2) the municipality's practice, as opposed to its formal policy, is to engage in the constitutional violation at issue."
>
> Green v. City of New York, 465 F. 3d 65, 80 (2d Cir. 2006), *citing* Amnesty v. Town of W. Hartford, 361 F.3d 113, 125-26  (2d Cir.2004).

Plaintiff understands that "before the actions of subordinate city employees can give rise to [municipal] § 1983 liability, their… [unconstitutional] practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." <u>Sorlucco</u> at 871 (internal citations omitted).  Plaintiff contends that the considerable body of fact evidence referenced and pled within the Complaint demonstrates the plausibility of the Plaintiff's allegation that his warrantless arrest, undertaken in the absence of probable cause, may have been the product of so-called "productivity goals" or arrest quotas for NYPD officers.  In a leaked internal NYPD memo[8] distributed under the signature of NYPD Chief of Patrol James P. Hall, it is stated that NYPD precinct "supervisors have made statements that could be interpreted as the setting of quotas for enforcement activity."  This memo reflects a high-level municipal awareness that NYPD supervisors may be setting enforcement quotas, but seems primarily oriented towards discouraging numerical quotas per se.  This approach misses the constitutional mark and constitutes constructive acquiescence to constitutional violations engendered by the practice of enforcement quotas, as it gives a tacit imprimatur to supervisors who spur their subordinate police officers to enhance their arrest and summons numbers regardless of actionable criminal activity. In conjunction with this municipal acquiescence, the Plaintiff has pled three separate substantiated and reported-upon allegations of NYPD arrest quotas that have been brought forward by whistleblowers from NYPD precincts throughout the city, *see* Plaintiff's Affirmation at Exhibits D-F.  For the purposes of the instant motion, the Plaintiff has plausibly pled Defendant City of New York's policy or practice of arrest and summons quotas to support a claim for <u>Monell</u> liability under established Second Circuit standards.  These allegations, if proven, would also support liability for failure to intervene.

Where, as here, multiple Defendant Officers failed to investigate facially dubious, contradictory and changing allegations, but instead initiated an arrest and prosecution on their basis, Plaintiff contends that it is equally plausible that their action was the willful product of improper motivations, i.e., quotas, or the product of negligence in training as to legal determination of probable cause in warrantless arrests.  Plaintiff has pled various theories of municipal liability and alleged factual support for each in the Complaint simply because it is impossible for him to determine without discovery whether his false arrest was the product of willful wrongdoing pursuant to departmental pressure, or

---

[8] *see* Plaintiff's Exhibit G; *see also* fn1.

21

the NYPD's failure to properly train the Defendant Officers, or simple negligence.  It would be a perversion of so-called "plausibility pleading" to prevent the Plaintiff from exploring these various theories because the proof as to which may be applicable here is solely in the possession of Defendants.

If the Mr. LaDoucier's arrest was the product of negligence in training as to legal determination of probable cause in warrantless arrests, then the failures of Defendant City to train its officers and agents renders Defendant City liable for Plaintiff's injuries at issue here under Monell v. Dept. of Social Services, 436 U.S. 658 (1978).  The Second Circuit has set forth a three-factor test for showing that a lack of training manifests sufficiently deliberate indifference on the part of a municipality to support a Monell claim.  Newton v. City of New York, 566 F. Supp.2d 256, 272 (S.D.N.Y. 2008) (internal citations omitted).  Reference to this three factor test shows that Plaintiff has sufficiently pled that Defendant City of New York's failure to train its police officers as to legal determination of probable cause in warrantless arrests manifested the Defendant parties' deliberate indifference to the constitutional rights of warrantless arrestees such as Mr. LaDoucier.

To satisfy the *first factor* the plaintiff must show that "a policymaker knows to a moral certainty that her employees will confront a given situation." Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992) (internal citation and quotation marks omitted).  The *second factor* is whether the situation will necessarily "either present[s] the employee with a difficult choice of the sort that training or supervision will make less difficult or [is one] that there is a history of employees mishandling…." Id. Finally, the *third factor* demands that the Plaintiffs must show that mishandling of the situation "is likely to deprive Citizens of Constitutional Rights." Id. at 298.

*Factor 1 - a policy-maker knows to a moral certainty that her employees will confront a given situation*.  It cannot be disputed that the policymakers for Defendant City knew or should have known that NYPD Officers would sometimes be called to determine whether probable cause exists to perform warrantless arrests, in scenarios including but not limited to when complaining witnesses make allegations of varying degrees of veracity.

*Factor 2 - there is a history of employees mishandling the situation / training would make the situation less difficult.*  Again, there can be no question that training police officers to determine whether probable cause is sufficiently established to justify a warrantless arrest would make those

22

situations less difficult for said officers.  It is also clear with reference to much of the case law cited above and in Defendants' Memo that NYPD officers (and police officers generally) have repeatedly, if not regularly, mishandled probable cause determinations in warrantless arrests in the past.

*Factor 3 – the mishandling of the situation is likely to deprive Citizens of Constitutional Rights.* The Plaintiff respectfully requests that the Court take judicial notice of the voluminous body of jurisprudence arising out of Fourth Amendment-violative warrantless arrests performed by agents of municipalities and other like state actors.  See, e.g., <u>Caldarola v. Calabrese</u>, 298 F.3d 156 (2d Cir. 2002); <u>Martinez v. Simonetti</u>.   It is tautological that being arrested without a warrant or probable cause violates a citizen's Fourth Amendment rights, and it follows from that elementary proposition that an officer mishandling a situation in which he or she is called upon to determine whether the allegations of a complaining witness give rise to probable cause to arrest a citizen will likely lead to a deprivation of that citizen's constitutional rights.

Plaintiff contends that analysis under this three-factor test demonstrates that liability may additionally be plausibly found to lie with Defendant City under <u>Monell</u> for failure to train the Defendant Officers.  For the reasons discussed above and on the basis of the detailed pleadings, the Plaintiff's <u>Monell</u> claims should be allowed to proceed to discovery in this case in their entirety.

**D.** **There Are Various Legal Standards Under Which This Honorable Court Can Retain Supplemental Jurisdiction Over Plaintiffs' State Law Claims**

**I.** **This Court Is In No Way Bound To Apply The State Of New York's Procedural Requirements In Hearing This Federal Question Case**

The Defendants propounding the instant motion cite no controlling precedent whatsoever for their proposition that the Plaintiffs' state law claims should be dismissed for failure to comply with New York State's notice of claim requirements.  Perhaps this is because no such precedent exists. While <u>Erie R. Co. v. Tompkins</u>, 304 US 64 (1938) stands for the proposition that Federal Courts must apply the **substantive** law of states in diversity actions, subsequent jurisprudence has made it clear that the Federal Courts are under no obligation to apply the **procedural** law of the states in federal question cases such as this one.  In the 1988 case of <u>Felder v. Casey</u>, the Supreme Court explained that "Notice-of-claim provisions… are neither universally familiar nor in any sense indispensable prerequisites to litigation, and there is thus no reason to suppose that Congress intended federal

courts to apply such rules, which 'significantly inhibit the ability to bring federal actions…. **notice-of-claim statutes are inapplicable to federal-court § 1983 litigation**….'" 487 U.S. 131, 140-41 (1988) (emphasis added) (internal citation omitted).  Plaintiffs recognize that most Courts that have interpreted this holding have restricted it to 1983 claims and not pendent state claims.

Even in the event that the federal, jurisdiction-conferring claims in this action are dismissed, this Court may still entertain Plaintiff's state law claims.  In Rodriguez v. City of New York, the Court recognized that "[a] district court has broad discretion to decide whether to exercise its supplemental jurisdiction over state law claims and **may** decline to do so if it 'has dismissed all claims over which it has original jurisdiction.'" 535 F. Supp. 2d at 444, *citing* 28 U.S.C. §1367(c)(3) (emphasis added); *see also,* Purgess v. Sharrock, 33 F. 3d 134, 138 (2d Cir. 1994) (the discretion implicit in the word "may" in subdivision (c) of § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants.).  Clearly this Court may hear the state law claims alleged by the Plaintiff even if Plaintiff's federal claims are dismissed, and this Court should do so in the interest of fairness to the litigants. However, for the reasons cited under Point I, the Court should not even need to reach this determination and this case should be allowed to proceed in its entirety.

## II.  Specific Notice Requirements of Pendent State Law Claims Should be Deemed Satisfied when Notice to Municipality is Obvious and Admitted

The Defendants propounding the instant motion seek to dismiss the Plaintiff's state law claims against them based on the failure to file a notice of claim as required by Municipal Law 50-e.  It is well-settled that such a requirement does not attach to the Federal Claims of a §1983 action.  Felder at 141. However, Plaintiff submits that such requirements for pendent state claims should also be exempt from such filing requirements when notice to the municipality is obvious and not disclaimed by the municipality.  Such is the case at hand.

Most Courts that have reviewed this specific statutory notice requirement, and other similar ones, recite the same dicta: these notice requirement statutes "are enacted primarily for the benefit of governmental defendants," and enable those defendants to "investigate early, prepare a stronger case, and perhaps reach an early settlement." Brown v. United States, 742 F. 2d 1498, 1506, 239 US App. DC 345 (D.C. Cir. 1984).  *See also*, Cardo v. Lakeland Cent. School Dist., 592 F. Supp. 765, 773 (S.D.N.Y.

1984) (The notice requirement allows a governmental subdivision a meaningful opportunity to investigate in a timely manner the circumstances that gave rise to the claim and protects them against fraudulent and stale claims"); Felder v. Casey, 487 U.S. 131, 143 (1988), citing, Nielsen v. Town of Silver Cliff, 112 Wis. 2d 574, 580, 334 N. W. 2d 242, 245 (1983); Binder v. Madison, 72 Wis. 2d 613, 623, 241 N. W. 2d 613, 618 (1976).  The notice requirement serves the additional purpose of notifying the proper public officials of dangerous physical conditions or inappropriate and unlawful governmental conduct, which allows for prompt corrective measures. See Felder at 143; Nielsen v. Town of Silver Cliff, 112 Wis. 2d 574, 580, 334 N. W. 2d 242, 245 (1983); Binder v. Madison, 72 Wis. 2d 613, 623, 241 N. W. 2d 613, 618 (1976).

However, the office policy of the Corporation Counsel not to settle – or even discuss – cases in claim, but to only open a file after a suit has been filed, is inapposite to the rationale for the strict notice requirement. Therefore, it is respectfully submitted that when (i) the City of New York has actual notice of a claim, and (ii) has undertaken an investigation of such a claim (such as a District Attorney's investigation), (iii) it should be estopped from using the notice provisions of the Municipal Law 50 to attempt to dismiss a claim, whether it be a claim steeped in state or Federal law.

**Conclusion**

For the reasons set forth herein, Mr. LaDoucier respectfully requests that this Court rule in his favor and find that the Complaint properly alleges facts that satisfy all pleading requirements.  The complaint sets forth plausible allegations that the Defendants' constitutionally violative conduct was undertaken under color of law and in violation of the Mr. LaDoucier's Fourth and Fourteenth Amendment rights; that this conduct was undertaken pursuant to constitutionally-violative municipal policies or practices and that this lawsuit is brought to compensate Mr. LaDoucier for this harm and declare the municipal policies at issue here constitutionally deficient.  This action should be allowed to proceed in its entirety.

Dated: January 20, 2011

New York, New York

_____~//s//~_____
Wylie M. Stecklow, Esq. (WS 6012)
Law Offices of Wylie M. Stecklow
Attorney for Plaintiff
10 Spring – N Y C 10012
(212) 566-8000

To:

**Michael A. Cardozo**
**Corporation Counsel of the City of New York**
Attorneys for Defendants City of New York,
Retired Police Officer Williams and
Police Sergeant Hernandez
100 Church Street
New York, New York 10007

Attn:   Diep Nguyen, Esq.

**Cheryl Nichols**
**Defendant Pro Se**
162 Albany Ave. Apt. 3C
Brooklyn, NY 11213

**David Eliot Duhan**
**Attorney At Law**
Attorney for Defendant Rafael Reveron
118-35 Queens Blvd. Suite 1515
Forest Hills, NY 11375